# In the United States Court of Federal Claims

No. 11-499C

(Filed October 22, 2012)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| HARTFORD FIRE INSURANCE COMPANY, | * <br> * Contract Disputes Act; Motion <br> * to Dismiss for Failure to State a |
| Plaintiff, | * Claim; Miller Act, 40 U.S.C. § <br> * 3131, Equitable Subrogation |
| v. | * Rights, Notice Requirement for <br> * Stakeholder Duty, Reasonable |
| THE UNITED STATES, | * Discretion In Disbursing Funds <br> * |
| Defendant. | * <br> * |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## OPINION AND ORDER

This case comes before the Court on defendant's Motion to Dismiss.

On August 2, 2011, plaintiff Hartford Fire Insurance Company ("Hartford"), a Connecticut corporation with its principal place of business in Hartford, Connecticut, filed a complaint in the Court of Federal Claims against the United States, acting specifically through the United States Army Corps of Engineers ("the Corps"). The complaint alleged the Corps wrongfully disbursed funds to Overstreet Electric Co. ("Overstreet"), a contractor for whom Hartford had acted as a Miller Act surety on two federal contracts with the Corps. Hartford seeks to exercise its right of equitable subrogation, and seeks damages of $700,000, which it claims the Corps wrongfully paid to Overstreet in violation of the government's stakeholder duty to the surety. The government filed a motion to dismiss under United States Court of Federal Claims Rules ("RCFC") 12(b)(1) and 12(b)(6), citing the Court's jurisdictional statute of limitations, and a failure to state a claim upon which relief may be granted. On April 11, 2012, the Court granted Hartford's unopposed motion to amend its complaint, clarifying Hartford's position on its accrual of its claim, damages, and settlement negotiations concerning the payment at issue. In its response, defendant withdrew its statute of limitations argument, but reiterated its arguments for dismissal under RCFC 12(b)(6).

This is a case which plaintiff seeks to fit within the holding in *Transamerica*, in which the Court of Appeals for the Federal Circuit held that a performance bond surety stated a cause of action against the government for equitable subrogation when it sought funds payable by the government to the contractor on an equitable adjustment to a separate contract. *Transamerica Ins. Co. v. United States*, 989 F.2d 1188, 1195 (Fed. Cir. 1993). This "two-contract" theory of recovery allowed the surety as equitable subrogee, to offset its loss on one contract with an amount due to the contractor on a second contract. *Id.* *Transamerica* distinguished a line of prior cases, and limited its holding to cases in which the balancing of the equities favored recovery. *Id.* at 1192-95.

I.   Background[1]

This case involves two federal contracts, both procured through the Army Corps of Engineers and awarded to Overstreet Electric Co. As required by the Miller Act for all construction contracts over $100,000, a surety – here, Hartford Fire Insurance Company – posted performance and payment bonds for the projects.[2] *See* Miller Act, 40 U.S.C. § 3131(b) (2011). Upon the prime contractor's default, the performance bond surety has the option of either completing the project itself, or of assuming liability for the government's excess costs in completing the contract. *Ins. Co. of the West*, 243 F.3d 1367, 1370 (Fed. Cir. 2001); *Aetna Cas. & Sur. Co. v. United States*, 845 F.2d 971, 975 (Fed. Cir. 1988). A third alternative is to provide the funds to an insolvent contractor to complete performance. *Ins. Co. of the West*, 243 F.3d at 1370.

On October 5, 2000, the Corps awarded Contract No. DACW27-01-C-0001 to Overstreet for the rehabilitation of pumping stations along the Little Calumet River in Lake County, Indiana ("Little Calumet Project"). Substantial completion was to occur by October 24, 2004. In accordance with the Miller Act, Hartford issued payment and performance bonds on the project in the amount of $4 million. On September 13, 2001, the Corps awarded Contract No. DACW21-01-C-001 to Overstreet for disposal area improvements and weir replacement in an area of the Savannah Harbor near Savannah, Georgia ("Savannah Project"). Hartford also issued payment and performance bonds for this project in the amount of $4,306,035.86.

---

[1] Unless otherwise indicated, the following facts are taken from plaintiff's amended complaint and exhibits.

[2] A payment bond surety is required to pay subcontractors, materialmen, and laborers in the event of a prime contractor's default. *See* 40 U.S.C. § 3131(b)(2); *Aetna*, 845 F.2d at 973. A performance bond surety guarantees that the project will be completed if the contractor defaults. 40 U.S.C. § 3131(b)(1); *Aetna*, 845 F.2d at 973-74 (citing *United States v. Munsey Trust Co.*, 332 U.S. 234, 244 (1947)).

Problems arose and on July 29, 2003, the Corps terminated Overstreet for default on the Savannah Project. Overstreet submitted a claim pursuant to the Contract Disputes Act ("CDA") on January 30, 2004, seeking a conversion to a termination for convenience based on its arguments of defective specifications, differing site conditions, and delay in performance due to the defective specifications. The Corps denied Overstreet's request, and on June 30, 2004, Overstreet filed suit against the Corps in the Court of Federal Claims. Fed. Cl. Docket No. 04-1067C. The government filed a counterclaim in the suit for $1.48 million.[3]

While the dispute over the Savannah Project was unfolding in late 2004 and early 2005, problems on the Little Calumet Project also developed. On February 7, 2005, the Corps issued a "Show Cause Notice" to Overstreet and Hartford, based upon Overstreet's failure to complete work within the schedule, and indicating it was considering a termination for default on the Little Calumet Project. The Corps directed Overstreet to respond in three days, and provide any information which would show the failure to perform was due to causes beyond its control. Overstreet did not respond within the three days. The contracting officer for the Little Calumet Project, Regina Blair, next sent a letter to Hartford, indicating its concern and lack of confidence in Overstreet's ability to complete the project. The Corps had been awaiting the delivery of a complete work plan since October 2004, which Overstreet never submitted, and failed again to submit by its guaranteed February 16, 2005 deadline. On March 9, 2005, Overstreet sent a letter to Hartford, indicating that it was "up against the wall on th[e] [Little Calumet] project" and without involvement by Hartford, the Contracting Officer would be "likely left with no viable option but to terminate the contract for default." On March 30, 2005, Blair sent a letter to Overstreet indicating default was imminent unless Overstreet commenced work on all "punch list" and incomplete on-site efforts that could be done without a pump rebuilding subcontractor.

Three weeks later, on April 19, 2005, there was a settlement conference regarding Overstreet's suit against the Corps for the Savannah Project. Following two days of negotiations, the Corps and Overstreet agreed to a complete settlement of claims. By its terms, the termination for default would be changed to a termination for convenience, and the United States would pay Overstreet $700,000. The settlement was contingent upon the Department of Justice's approval. Hartford states that although its attorney attended the settlement conference, "he did so as an observer to obtain information concerning the government's claim against Overstreet" and "did not actively participate in the settlement negotiations."

---

[3] On August 2, 2005, pursuant to RCFC 41(a)(1), the parties stipulated and agreed to dismiss the action with prejudice, in accordance with the Settlement Agreement. Notice of Voluntary Dismissal, Aug. 2, 2005, ECF No. 14; Pl.'s Ex. 10.

3

On June 20, 2005, Gary Judd of Hartford sent an email to Blair, regarding the Little Calumet Project. The email stated, among other things, that in their conversation, he "advised and requested that the Corps exercise its rights as an owner/obligee with other contracts with Overstreet Electric [sic] to offset or withhold payments that may be due Overstreet Electric to secure the Corps and the Hartford to those funds by way of its equitable rights of subrogation that it has as a result of Overstreet Electric's default on this project and others." In this notice he specifically referred to the $700,000 in settlement funds owed from the Savannah Project, which was scheduled to be paid to Overstreet. He requested that the Corps "not release any further payments on either project with [the Little Calumet contract] [ ] office or the project in the Savannah District."

On July 8, 2005, the Department of Justice approved the settlement for the Savannah Project, and the Corps and Overstreet executed the Settlement Agreement. On July 26, 2005, Overstreet received payment in accordance with its terms. On February 22, 2006, the Corps terminated the Little Calumet Project for default due to "serious failure to prosecute the remaining work items under the Contract."

On August 14, 2006, Charles Moorer of Hartford sent a letter to Little Calumet contracting officer Blair, reiterating that the Corps had failed to offset the settlement proceeds from the Savannah Project; Blair replied, stating that she could not collect monies to do so "because there was a formal claim issue at hand." Moorer responded on October 31, 2006, reiterating the Corps exercise its right to offset and withhold payments due to Overstreet to secure Hartford's equitable subrogation rights. Following Overstreet's default on the Little Calumet Project, Hartford undertook completion pursuant to the terms of its bonds in January 2008, and completed the project in 2009. Hartford's costs in completing the project exceeded the Little Calumet Project funds remaining, and even after applying funds received from the Corps, Hartford spent more than $1.6 million.

Hartford therefore claims that the balance paid under the government's Settlement Agreement for the Savannah Project should not have been paid to Overstreet, but rather that Hartford by its right of equitable subrogation, was entitled to the settlement proceeds due Overstreet. In so arguing, Hartford asserts that once the government was notified of Overstreet's imminent default on the Little Calumet Project, it became a "stakeholder" with a duty to Hartford in administering funds. It further supports its case with the government's well-established set-off right, which had the government been the one to complete the Little Calumet Project, it may have offset its loss on that project with the amount due Overstreet pursuant to the Savannah Project's Settlement Agreement.

Defendant's motion argues that the current case falls under the *Dependable* line of cases, rather than the *Transamerica* decision, and as such, Hartford's recovery should be limited to the retained Little Calumet Project funds,

as that was the project generating the claim. *See Dependable Ins. Co., Inc. v. United States*, 846 F.2d 65, 67 (Fed. Cir. 1988) (citing *Security Ins. Co.*, 428 F.2d 838, 844 (Ct. Cl. 1970)). Defendant states that *Transamerica* involved an agency-level, consensual equitable adjustment on the second contract, and specifically limited its holding to cases in which the government did not have a "competing claim" and where after "counterbalanc[ing] [ ] the other interests involved", the equities favor recovery. Def.'s Mot. to Dismiss 15-16; *Transamerica*, 989 F.2d at 1194-95. Defendant contends that the Settlement Agreement at issue here, in which the Corps and Overstreet settled competing claims, is precisely the "competing claim" situation envisioned by the Federal Circuit in limiting *Transamerica*. Def.'s Mot. to Dismiss 16. It further argues that extending *Transamerica* to this situation "strains the doctrine beyond its limits" and would allow a surety to impede or prohibit the government's settlement efforts. *Id.* at 18; Def.'s Resp. to Pl.'s Sur-reply 2. It points out that rather than unexpended contract funds, which may be sought by a surety, the settlement here came from the Judgment Fund, which is distinct from funds allocated to a particular project. Def.'s Reply in Supp. of Mot. to Dismiss 2-3.

Defendant also argues that plaintiff fails to state a claim because Hartford's notice to the government was insufficient, as the surety incorrectly notified only Regina Blair, the Little Calumet contracting officer, and not the Savannah contracting officer or the Department of Justice. Def.'s Mot. to Dismiss 20-22. It maintains that as the funds sought were paid from the Judgment Fund pursuant to a settlement, no one in the Corps, let alone the contracting officer from an unrelated office was responsible for the payment, and thus Hartford's notice was inadequate to impose a stakeholder duty. *Id.* at 20-22.

Defendant next contends that Hartford could not succeed to the government's right to set-off the funds, as on the date of the settlement payment, the government itself did not even possess that right as it had not yet terminated the Little Calumet Project for default, and thus nothing was owed it yet. *Id.* at 22-24. It alleges that any lawsuit Hartford might have would be more akin to an impairment of suretyship claim, which cannot be maintained against the United States. *Id.* at 25. Finally, defendant argues that Hartford cannot assert that it was damaged by the settlement payment because the Settlement Agreement actually limited Overstreet's liability to the government by dismissing the reprocurement costs on the Savannah Project, and as Overstreet's surety, Hartford actually benefitted from the settlement through a limitation on its own liability. *Id.* at 26-28.

Plaintiff responds that this case closely follows *Transamerica*, in which a performing surety was permitted to state a claim to recover funds from an equitable adjustment "settlement" on a second contract. Pl.'s Sur-reply to Def.'s Mot. to Dismiss 2. As further evidence of its right to set-off, plaintiff introduces the *Applied* decision, which stands for the government's ability to use its right of set-off even against settlement proceeds. *Id.* at 3; *Applied Cos. v. United States*,

5

144 F.3d 1470, 1475 (Fed. Cir. 1998).  It maintains that just like in that case, the Settlement Agreement at issue here did not expressly limit the government's common law right to set-off debts due to it.  Pl.'s Sur-reply to Def.'s Mot. to Dismiss 3. Defendant replies that the Settlement Agreement *did* limit the right to set-off the debt, in that it expressly provided that Overstreet was the "sole owner" of its claim, and would only dismiss its lawsuit after receiving payment pursuant to the Agreement. Def.'s Reply to Pl.'s Sur-reply 6. Finally, plaintiff asserts that the fact Overstreet was not terminated for default until February 2006 does not displace the government's stakeholder duty with respect to the funds, and that the government's delay in declaring a formal default cannot excuse its stakeholder duty to consider Hartford's interest in the funds.  Pl.'s Sur-reply to Def.'s Mot. to Dismiss 6.

   II.   Discussion

      A. Legal Standard

In order to survive a motion to dismiss under RCFC 12(b)(6), a plaintiff must establish that the complaint "adequately states a claim," that is, that the complaint "contain[s] either direct or inferential allegations respecting all the material elements necessary to sustain recovery under *some* viable legal theory." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 562 (2007) (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)). A well-pleaded complaint will survive a motion to dismiss even if it appears "that a recovery is very remote and unlikely." *Id.* at 556 (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)). When reviewing a motion to dismiss for failure to state a claim upon which relief may be granted, the court "must accept as true all the factual allegations in the complaint . . . and [ ] indulge all reasonable inferences in favor of the non-movant." *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001) (citations omitted). Allegations in the complaint need not be overly detailed, but do need to "raise a right to relief above the speculative level" or "nudge[ ][the] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 555, 570. "[O]nce a claim has been stated adequately," however, "a plaintiff receives the benefit of imagination so long as the hypotheses are consistent with the complaint." *Id.* at 563 (citation and internal quotes omitted).

      B. Doctrine of Equitable Subrogation

A surety bond is a three-party relationship, in which the surety becomes liable for the principal's debt or duty to the third party obligee (here, the government). *Ins. Co. of the West*, 243 F.3d at 1370; *United States Sur. Co. v. United States*, 83 Fed. Cl. 306, 310 (2008). A performance bond surety may discharge its obligation to the government on a defaulted contract either by taking over and completing performance of the contract or, if it lets the government reprocure the contract, by assuming liability for the costs of completion that

exceed the original contract price. *Westchester Fire Ins. Co. v. United States*, 52 Fed. Cl. 567, 574 (2002) (citing *Ins. Co. of the West*, 243 F.3d at 1370).

It is well established that "a surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed." *See e.g.*, *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 137 (1962). The remedy of equitable subrogation thus allows a performing surety to step into the shoes of the benefitted party. *See id.* The right of subrogation is not founded on contract but "[i]t is a creature of equity; is enforced solely for the purpose of accomplishing the ends of substantial justice; and is independent of any contractual relations between the parties." *Memphis & Little Rock R.R. Co. v. Dow*, 120 U.S. 287, 301-02 (1887).

A surety fulfilling an obligation under a performance bond has different and more expansive rights than under a payment bond. *Aetna*, 845 F.2d at 974. Unlike a payment bond surety, a performance bond surety may recover from retained contract funds the amount it expended in completing the contract free from set-off for taxes owed by the contractor. *See Nova Cas. Co. v. United States*, 69 Fed. Cl. 284, 293 (2006); *United States Fid. Guar. Co. v. United States*, 475 F.2d 1377, 1383 (Ct. Cl. 1973); *Security Ins. Co.*, 428 F.2d at 839. The performing surety is in this position due to its equitable right of subrogation to the contract funds retained by the government. *See Pearlman*, 371 U.S. at 138. Thus, where a surety takes over contract performance, the surety succeeds to the contractual rights of both the defaulted contractor and the government itself. *United States Sur. Co.*, 83 Fed. Cl. at 310 (citing *Security Ins. Co.*, 428 F.2d at 841-42). The surety is "entitled to the funds in the hands of the government not as a creditor subject to set-off, but as a subrogee having the same right to the funds as the government." *Id.* (internal quotation omitted). The rationale for this rule is that by performing the contract itself, the surety confers a benefit upon the government by relieving it of performance. *See Dependable Ins. Co., Inc.*, 846 F.2d at 67. *But see United States Sur. Co.*, 83 Fed. Cl. at 311 (performance bond surety who executes takeover agreement does not defeat government's entitlement to liquidated damages from contract funds).

Ordinarily, a Miller Act surety asserts the doctrine of equitable subrogation to acquire retained contract funds that are still in the government's possession after performance of the contract is complete. *See, e.g.*, *Prairie State Nat'l Bank of Chicago v. United States*, 164 U.S. 227, 227-28 (1896). The doctrine, however, has been expanded to allow a surety to recover from the government when the government abuses its discretion in disbursing earned progress payments. *See* 40 U.S.C. § 3131; *Nat'l Am. Ins. Co. v. United States*, 72 Fed. Cl. 451, 458 (2006) (government liable for violating its stakeholder duty by making a final payment to contractor after surety notified the government that it was asserting a right to the contract funds); *Capitol Indem. Corp. v. United States*, 71 Fed. Cl. 98, 102 (2006).

7

It is well settled that the government, like any other creditor, retains the right "to apply the unappropriated moneys of [its] debtor, in [its] hands, in extinguishment of the debts due to [it]." *Munsey Trust Co.*, 332 U.S. at 239 (internal citations omitted); *Bank of Am. Nat'l Trust & Sav. Ass'n v. United States*, 23 F.3d 380, 384 (Fed. Cir. 1994). The set-off right applies to government claims both under other contracts and under the same contract. *Johnson v. All-State Constr., Inc.*, 329 F.3d 848, 852 (Fed. Cir. 2003) (citing *William Green Constr. Co. v. United States*, 477 F.2d 930, 936 (Ct. Cl. 1973); *Cecile Indus., Inc. v. Cheney*, 995 F.2d 1052, 1054 (Fed. Cir. 1993)). The right to set-off is preserved unless there is explicit statutory or contractual provision that bars its exercise. *See Johnson*, 329 F.3d at 853-54; *Applied Cos.*, 144 F.3d at 1475.

In *Applied*, a contractor entered into several contracts to supply air conditioning units to the government, one of which was terminated for default. *Applied Cos.*, 144 F.3d at 1473. The Armed Services Board of Contract Appeals converted the termination for default into a termination for convenience, and the parties arrived at a settlement agreement under which the government agreed to pay approximately $2.8 million to resolve all claims from the terminated contract. *Id.* Rather than pay that sum, however, the government paid only $911,604.11, and used the remainder of the amount to offset two erroneous overpayments made to Applied three years earlier on another contract. *Id.* Applied sought review in this Court, which granted summary judgment for the government and held that nothing in the agreement deprived the government of its common law set-off right. *Id.* at 1475. The Federal Circuit affirmed, stating "[w]e are aware of no principle of contract law that would justify prohibiting the government from exercising its setoff right against the settlement agreement proceeds any more than against any other obligation . . . to a party that owed the government money in return." *Id.*

Similarly, the Civilian Board of Contract Appeals in *Global Ship Systems*, citing *Applied*, held that the government's set-off right extended to a settlement agreement on a separate contract, despite the "no exceptions" language in the agreement, specific language to deposit funds in a designated account, and the contractor's subsequent statements that it would never have settled the appeal for the amount had it known setoff would be claimed in an unrelated matter. *Global Ship Systems, LLC v. Dep't of Homeland Security*, CBCA 923, 10-2 BCA ¶ 34,496. *See also East Coast Security Services, Inc. v. Dep't of Homeland Security*, DOT BCA 4469R, et al., 06-1 BCA ¶ 33,290 (permitting set-off from settlement amount to pay down another of contractor's debts to government still sufficiently effectuated the intent of the agreement). Like the settlement agreement in *Applied*, here too a termination for default was converted into a termination for convenience with an amount of money to be paid the contractor to resolve all claims from the terminated contract. *Applied*, 144 F.3d at 1473. Plaintiff argues that it is precisely this set-off right that it is entitled to exercise as an equitable subrogee.

8

After a consideration of the on-point surety case law, contrary to the government's assertions, the Court finds this case adheres more closely to the *Transamerica* facts than the earlier *Dependable* line of cases limiting relief to the single contract at issue.[4] In its decision in *Transamerica*, the Federal Circuit emphasized the importance of relief for the surety, who would never undertake the job of completion if doing so would leave it worse off than the government, had it completed the job. *Transamerica*, 989 F.2d at 1192. On the facts of that case, the Court found "nothing in the law of suretyship to cause us to favor allowing [ ] the defaulting contractor, to be better off simply because the surety, rather than the government, completed a contract and thereby incurred damages." *Id.* at 1194. The same incentives apply here, where if the Corps had taken it upon itself to complete the Little Calumet Project, it may have offset the costs against the settlement agreement payable to Overstreet. *See Applied*, 144 F.3d at 1475.

Referencing *Transamerica*, the government distinguishes that case by citing the government's competing claims and interest in settling claims and maintaining its funds. Def.'s Mot. To Dismiss 15-16. *Transamerica*, however, also involved the same interests of the government in securing contract performance and value for the public fisc. This is the whole point of an equitable adjustment, which frequently give rise to litigation under the CDA, similar to the contested termination for default conversion in this case. Like in *Transamerica* in which the government owed an amount to the contractor under a separate contract (whether for an equitable adjustment or equitable adjustment "settlement"), here too the parties arrived at a sum certain payable by the government to Overstreet on the separate Savannah Project. Regardless of the lack of consensus and litigation that ultimately brought about the owed amount, the government had become a stakeholder to the sum, and Overstreet the only claimant. Like in *District of Columbia v. Aetna,* which the Federal Circuit relied upon as the "only case on point" in deciding *Transamerica*, except for the contractor, there was no other claimant to the amount owed on the second contract, and thus where "the only claimants to monies held by a government agency are the surety and a defaulting contractor, the surety . . . is subrogated to all of the rights and remedies which the government might have had against the principal had the government been forced to complete the project itself." *Transamerica*, 989 F.2d at 1190-91 (citing *Dist. of Columbia v. Aetna Ins. Co.*, 462 A.2d 428, 432 (D.C. Ct. App.

---

[4] In 1998, this Court in *Intercargo Ins. Co. v. United States* seemed to restate the pre-*Transamerica* limitation on the surety's ability to recover on a single contract. *Intercargo Ins. Co. v. United States*, 41 Fed. Cl. 449, 457-58 ("the surety's right to subrogation arises *only as to the monies due under the contract in question*.") (emphasis added). Rather than interpret this as revitalization of *Dependable*, however, that case involved a surety's attempt to reach funds not yet earned by the contractor, and the Court likely intended the emphasis to be on the words "only monies due." *Id.* Any other reading would only serve as dictum to the holding, and regardless, this Court remains bound by the Federal Circuit's decision in *Transamerica*.

1983)). These remedies include the common law right of set-off. *See id.* at 1191 (internal quotation omitted). Hartford should likewise be subrogated to the government's right of set-off with respect to the amount owed Overstreet.

The Court is also not persuaded that there is a great distinction between the source of the settlement funds, such that it should deprive plaintiff of relief. In *Transamerica*, the equitable adjustment was presumably to be paid from retained contract funds for the separate Commissary contract. While contract funds are the natural preference from which to pay disputed claims, once these are exhausted, the judgment fund becomes the source of payments for awards under the CDA. *See* 31 U.S.C. § 1304. The fact that the funds are not drawn directly from appropriated contract funds would not prevent them from being collected by Overstreet, and it should not prevent Hartford from seeking the same. This outcome "avoids the anomalous result" whereby the performance bond surety would be worse off for having undertaken performance, *Security Ins. Co. v. United States*, 428 F.2d at 844, and addresses the Supreme Court's concern in *Munsey* that "a surety would rarely undertake to complete a job if it incurred the risk that by completing it might lose more than if it had allowed the government to proceed." *Munsey Trust Co.*, 332 U.S. at 244. The Sixth Circuit noted similar concerns in the bankruptcy case *In re Larbar*, which reasoned that if "denied the right to setoff than the surety might be tempted to 'cut corners' rather than promptly and properly complete the losing contracts." *In re Larbar Corp.*, 177 F.3d 439, 447 (6th Cir. 1999).

Finally, *Transamerica* refutes the government's contention that burdening it as a "stakeholder" in that situation will lead to the parade of horribles, and suggests that an interpleader action may be appropriate in some cases. *Transamerica*, 989 F.2d at 1194. This Court finds the equities similar enough to those in *Transamerica* that here too "it would be against fairness and good conscience to allow the defaulting contractor to benefit . . . at the expense of the fully performing surety." *Transamerica*, 989 F.2d at 1195. *See also In re Larbar*, 177 F.3d at 445-47 (finding "mutuality" existed under Kentucky law such that the surety for a contractor in Chapter 7 bankruptcy succeeded to the setoff rights of the state in both state and federal contracts; the proceeds earned on some government contracts could reimburse it for the loss taken on others).

The government contends that even had Hartford become equitably subrogated to the government's right to set-off, no right to set-off existed as of the date the settlement payment was made. Def.'s Mot. to Dismiss 22-24. A surety's right to equitable subrogation relates back to the date on which it executed the performance and payment bonds. *Ins. Co. of the West v. United States*, 55 Fed. Cl. 529, 543 (2003) (surety's subrogation claim was not limited to last of three progress payments made to a defaulting contractor on ground that surety did not begin to finance performance until after the first two payments had been made). It is, however, a general principle of equitable subrogation that "one cannot acquire by subrogation from another, rights which that person did not have." *Ram Constr.*

*Co., Inc. v. Am. States Ins. Co.*, 749 F.2d 1049, 1055 (3d Cir. 1984) (quoting *Munsey Trust Co.*, 332 U.S. at 242). *See also Intercargo Ins. Co*, 41 Fed. Cl. at 458-59 (surety could not state claim for equitable subrogation when it sought contract funds not earned by and therefore not due to the contractor). Similarly, sureties cannot use equitable subrogation as a vehicle by which to pursue claims against the government that the contractor neglected to pursue under the CDA. *See Universal Sur. Co. v. United States*, 10 Cl. Ct. 794, 798 (1986) (surety could not succeed to funds not sought by the prime contractor pursuant to the CDA). Instead, it is limited to agreed upon contractual liabilities, and the surety does not have the right to convert disputed amounts into "liquidated and therefore certain sums." *Id.* Thus, equitable subrogation exists to allocate proceeds of already-established rights, not to create new ones.

Defendant's timing argument does create an obstacle to plaintiff's recovery; however, if as plaintiff asserts, "Overstreet was certainly indebted to the Government" such that the Corps could have collected on the Little Calumet Project, or alternatively, that the Corps unreasonably delayed in its termination for default in violation of its stakeholder duty to the surety, *see infra* Part II.B.2, then Hartford maintains an avenue for relief. Pl.'s Sur-reply to Def.'s Mot. to Dismiss 5-6. Because the Court assumes all reasonable inferences in plaintiff's favor, plaintiff has succeeded in alleging a theory of recovery sufficient to withstand the government's motion to dismiss.

1. Notice Requirement for Stakeholder Duty

The government owes no duty to a surety until it may be called upon to perform, and when it may become a party to the bonded contract. *Fireman's Fund Ins. Co. v. United States*, 909 F.2d 495, 499 (Fed. Cir. 1990). To assert the doctrine of equitable subrogation to hold the government liable for improper payments, the surety must notify the government that the contractor is or is close to being in default. *See Capitol Indem. Corp.*, 71 Fed. Cl. at 102; *Nova Cas. Co.*, 69 Fed. Cl. at 297; *Ransom v. United States*, 17 Cl. Ct. 263, 272 (1989), *aff'd*, 900 F.2d 242 (Fed. Cir. 1990) ("[B]efore any obligation arises to withhold or divert funds, the Government must be notified that the sureties believe the contractor is in default and cannot complete the contract.").

Thus, notice that the contractor is in default and that the surety is invoking its rights to the remaining contract proceeds converts the government into a stakeholder with duties to the surety. *United States Fire Ins. Co. v. United States*, 78 Fed. Cl. 308, 326 (2007) (internal quotations omitted); *Nova Cas. Co.*, 69 Fed. Cl. at 297; *Am. Ins. Co. v. United States*, 62 Fed. Cl. 151, 155 (2004); *Ins. Co. of the West v. United States,* 55 Fed. Cl. 529, 539 (2003); *Transamerica Premier Ins. Co. v. United States*, 32 Fed. Cl. 308, 314 (1994); *Ransom*, 900 F.2d at 245. Without such notice, the duty, and the concomitant ability to invoke this court's jurisdiction, generally do not attach. *See Ins. Co. of West,* 243 F.3d at 1371. It is irrelevant whether the surety is claiming rights to funds during performance of the

contract or after it is completed; when the government functions as "stakeholder" of funds owed but not yet paid, notice by surety is essential before any governmental duty exists. *Fireman's Fund Ins. Co.*, 909 F.2d at 498.

In examining what constitutes adequate notice, the contractor's default alone is not sufficient to trigger a government obligation to consider the surety's interests or to withhold progress payments to the contractor. *Capitol Indem. Corp.*, 71 Fed. Cl. at 103 (citing *Ransom*, 900 F.2d at 242). Rather, the *surety* must explicitly notify the government of the default or threatened default, and not vice versa. *United Sur. and Indem. Co. v. United States*, 87 Fed. Cl. 580, 593-94 (2009) (warnings of the contractor's payment deficiencies from subcontractors and suppliers to the government does not substitute for Miller Act surety's notice to trigger stakeholder duty; "[t]he Government's independent knowledge of contractor default is irrelevant."); *Ins. Co. of the West*, 83 Fed. Cl. at 541 ("Government owes no duty to consider the interests of the surety until the surety *itself* expresses its own concern. . . .") (emphasis added); *Travelers Indem. Co. v. United States*, 72 Fed. Cl. 56, 67 (2006) ("[N]otice must be by the surety and not a third party.") (citing *Fireman's Fund Ins. Co.*, 909 F.2d at 499); *Fireman's Fund Ins. Co. v. United States*, 909 F.2d 495, 498 (Fed. Cir. 1990) ("[N]otice by the surety is essential before any governmental duty exists."); *Random*, 900 F.2d 243 (finding surety could not assert the equitable doctrine of subrogation *when the government notified the surety* it was concerned as to the contractor's default) (emphasis added). *See also Capitol Indem. Corp.*, 71 Fed. Cl. at 103-04 (pre-existing escrow account arrangement for payment on contract did not constitute notice by surety as to contractor's imminent default, nor could constructive notice be assumed from progress reports showing contractor's deficient progress).

Because the surety may decide that its interests are best served by continuing to have payments sent directly to the principal contractor, constructive notice that a contractor has defaulted and the surety has taken over the performance of the contract is insufficient, standing alone, to trigger equitable subrogation whereby the government has a duty to withhold or divert funds. *Am. Ins. Co. v. United States*, 62 Fed. Cl. 151, 155 (2004). *But see Capitol Indem. Corp*, 71 Fed. Cl. at 104 ("[G]overnment's equitable duty to consider the surety's interests is not triggered absent explicit notice either *directly or indirectly* from the surety.") (emphasis added) (citing *Ransom*, 900 F.2d at 245). Notice must also be specific enough to alert the government to the contract at issue. *Ins. Co of the West*, 83 Fed. Cl. at 542 (letter to contracting officer reasonably provided notice as to potential default on all bonded contracts referenced in the caption).

Further, notice of even a *potential* default can suffice to trigger the government's stakeholder duty. *Ins. Co of the West*, 83 Fed. Cl. at 540-41; *Capitol Indem. Corp.*, 71 Fed. Cl. at 102-03 ("[I]s [defaulted] or is close to being in default . . . [T]he surety must explicitly notify the government of the default or threatened default."); *Lumbermens Mut. Cas. Co. v. United States*, 67 Fed. Cl. 253, 255 (2005) (no relief where surety did not notify government that contractor was "approaching default"); *Hartford Fire Ins. Co. v. United States*, 40 Fed. Cl.

520, 522-23 (1998) ("has defaulted or is in danger or defaulting"); *Am. Fid. Fire Ins. Co. v. United States*, 513 F.2d 1375, 1379-80 (Ct. Cl. 1975) (finding surety's letter containing citations to California Civil Code and "danger signals" of default triggered government's stakeholder duty).

Once this adequate notice is given, the government becomes a stakeholder in the funds and, effectively, "the government pays out to the contractor at its own risk beyond that point." *Universal Sur. Co.*, 10 Cl. Ct. at 798. Thus the act of releasing money does not save the government from liability to the party who rightfully should have been paid. *District of Columbia v. Aetna*, 462 A.2d at 432 ("Interpleader was created precisely for situations such as this . . . ."). Although the vast majority of cases in this line all stand for the government's stakeholder duty with regard to retained contract funds, a similar stakeholder duty extends to amounts due a contractor under the settlement of a separate contract. *See Transamerica*, 989 F.2d at 1194.

Here, Hartford sent its notice in an email to Regina Blair, the contracting officer for the Little Calumet Project, and stated that it could not find the number for the Savannah contacting officer, Julie Anderson. Pl.'s Ex. 9. The government argues that the Department of Justice, as the agency responsible for the settlement funds called for by the agreement, would have been the proper contact to stop the payment. The Court finds that for this stage of stating a claim, petitioner's email to Blair may have been adequate to put the Corps on notice of its stakeholder duty. The existence of *some* means of trying to contact the Corps is apparent in the complaint, and the fact that Blair in turn contacted the Savannah office to inquire about collecting monies from that contract show that the government could be found on notice of Hartford's assertion of its rights enough to impose a stakeholder's duty. *See* Pl.'s Ex. 13. The government's assertion that notice was required to be to the Justice Department as guardian of the Judgment Fund is unconvincing. Had Overstreet violated the terms of the proposed settlement agreement, the Corps likely would not have hesitated to contact the Department of Justice to prevent payment. Since notice is all plaintiff must assert in order to survive a motion to dismiss, and we give plaintiff every benefit of the doubt at this stage, this issue is best left to be decided on the merits.

2. Reasonable Discretion in Disbursing the Funds

The "stakeholder" duty to act with reasoned discretion does not automatically require the government to withhold progress payments, but rather requires consideration of the surety's interest in any decision to disburse payment. *Ins. Co. of the West*, 83 Fed. Cl. at 543. *Compare Argonaut Ins. Co. v. United States*, 434 F.2d 1362, 1368-69 (Ct. Cl. 1970) (government did exercise discretion responsibly when refusing to withhold a progress payment), *with Nat'l Am. Ins. Co.* 72 Fed. Cl. 451, 458-59 (2006) (government liable when violated stakeholder duty and unresasonably made payment to contractor, despite notice by surety that it was asserting rights to the funds).

The scope of reasonable discretion afforded varies. In cases in which the surety notifies the government that the contractor is in default on one of its bonds, but performance under the contract has not been completed, the government has "broad discretion and flexibility" in deciding whether to withhold payments. *Balboa Ins. Co. v. United States*, 775 F.2d 1158, 1164 (Fed. Cir. 1985). "During the performance of the contract, the Government has a duty to exercise its discretion responsibly and to consider the surety's interest in conjunction with other problems encountered in the administration of the contract." *Argonaut Ins. Co.*, 434 F.2d at 1368. *See also Nat'l Surety Corp. v. United States*, 118 F.3d 1542, 1546 (Fed. Cir. 1997); *United States Fire Ins. Co.*, 78 Fed. Cl. at 334; *United States Fid. & Guar. Co.*, 475 F.2d at 1384.

Where performance is complete and the government has already accepted the performance, however, it is bound by the traditional duty of reasonableness, and is not accorded the greater discretion it otherwise would have been permitted had the contractor not completed performance. *Travelers Indem. Co.*, 72 Fed. Cl. at 67 (finding government violated its duty as stakeholder by releasing contract retainage after accepting performance, despite surety's notification that contractor had defaulted on its payment bond); *Int'l Fid. Ins. Co. v. United States*, 25 Cl. Ct. 469, 477 (1992) (discussing the government's interest in paying the contractor during performance in order to insure timely completion of the project, but finding "[a]fter completion, the government has no valid reason to decide the merits itself."). Thus, after performance, the government's interest in retaining funds to ensure contract completion disappears and the contractor's and surety's interests in the retained funds become paramount. *Transamerica Premier Ins. Co.*, 32 Fed. Cl. at 315. "Bluntly put, the Government's interest at this point does not extend beyond avoiding liability for sending the retained funds to the wrong party." *Id.* at 315-16.

Ultimately, the reasonableness of the government's actions, including the decision to release payments to the contractor, is a factual question to be determined at trial. *Ins. Co of the West*, 83 Fed. Cl. at 543 (citing *Balboa*, 775 F.2d at 1162). In *Balboa*, the Federal Circuit considered eight factors to determine whether the government exercised reasoned discretion in distributing funds once it was alerted to the potential default. *Balboa*, 775 F.2d at 1164.

Here, Hartford alleges that the government's breach of discretion with regard to disbursing the funds stems from its failure to exercise its right of set-off on the Little Calumet Project, and allocate this amount to Hartford as the equitable subrogee. Pl.'s Am. Compl. ¶¶ 32-35. Hartford maintains that the government did in fact have the right to set-off its debt from the settlement proceeds, or that its delay in terminating the Little Calumet Project for default violated its stakeholder duty to consider the surety's interest. Pl.'s Sur-reply to Def.'s Mot to Dismiss 5-6. These are questions of fact, which are not to be decided at this stage. *See Int'l Fid. Ins. Co.*, 25 Cl. Ct. at 480 (precluding

summary judgment because "[w]hether the government has acted within a reasonable time after default is a question of fact" and the reasonableness of the Postal Service's conduct in terminating for default presented a genuine issue of material fact).

Therefore, the question of whether the government used reasonable discretion in distributing the funds to Overstreet, or as plaintiff contends, failed to promptly terminate the Little Calumet Project and exercise its right to set-off for the surety's benefit are questions of fact, not to be resolved in a motion to dismiss.

III. Conclusion

The Court finds that Hartford has adequately stated its claim, because it has alleged sufficient facts "respecting all the material elements necessary to sustain recovery under *some* viable legal theory." *Twombly,* 550 U.S. at 544. Accordingly, the government's motion to dismiss this case pursuant to Rule 12(b)(6) of the RCFC for failure to state a claim upon which relief can be granted is hereby DENIED. As factual questions remain in dispute, the parties shall file a joint status report by Thursday, November 15, 2012 regarding the course of further pretrial proceedings.

IT IS SO ORDERED.

                                           s/Bohdan A. Futey
                                           **BOHDAN A. FUTEY**
                                                    **Judge**